UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PEDRO MENDIOLA and JUAN CARLOS CRUZ VALENTIN, | ) ) ) | |
| | ) | 18 C 8536 |
| Plaintiffs, | ) ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) ) | |
| JOHN HOWLEY and GALWAY PAINTING, INC., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Pedro Mendiola and Juan Carlos Cruz Valentin allege in this suit that their former employer, Galway Painting, Inc., and its president, John Howley, violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, by failed to pay them minimum and overtime wages. Doc. 1. With discovery closed, Plaintiffs move for partial summary judgment on liability on their overtime wage claim. Docs. 59, 60. The motion is denied.

## Background

The court recites the facts as favorably to Defendants as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Galway is a commercial painting contractor, and Plaintiffs are painters who performed jobs for Galway over the course of several years. Doc. 72-1 at p. 1, ¶¶ 1-2; Doc. 74 at ¶ 2. Plaintiffs did not receive overtime wages from Galway for the hours they worked in excess of forty per week. Doc. 72-1 at p. 2, ¶ 4. The key question in this case is whether Plaintiffs were

1

(1) employees to whom Defendants owed overtime pay under the FLSA and the IMWL or, rather, (2) independent contractors to whom Defendants owed no such duty. The pertinent facts on that question are as follows.

Valentin performed jobs for Galway from October 2016 through February 2018. *Id*. at p. 1, ¶ 2. According to Defendants, whose version of the facts must be accepted at this stage, Mendiola performed jobs for Galway from 2011 until 2013, took a break from the company for about a year, and resumed working with it from mid-2014 through May 2018. Doc. 72-4 at ¶ 4; *see* Doc. 72-1 at p. 1, ¶ 1.

At the time Plaintiffs began working with Galway, they were "experienced painters," "skilled in spray techniques, manual painting, spackling and sanding[,] and in the use of scaffolding and painter stilts to reach difficult spaces." Doc. 72-4 at ¶ 8; *see* Doc. 74 at ¶ 24. Defendants "did not train or direct [Plaintiffs] in the performance of their trade," but they did expect Plaintiffs to do a professional job and leave their worksites in a clean condition. Doc. 72-4 at ¶ 8.

Plaintiffs worked in crews of two or more painters at each worksite. Doc. 72-5 at 18 (68:3-11). Mendiola occasionally brought friends to a worksite "to help do the job." *Id*. at 16 (59:12-13); *see* Doc. 74 at ¶ 25. Defendants were responsible for identifying worksites and directing crews to report to those worksites. Doc. 72-1 at p. 5, ¶¶ 15, 18. Once at a site, Plaintiffs were "basically unsupervised." Doc. 74 at ¶ 24. Mendiola testified that Howley, while nominally his "direct supervisor," would visit a worksite just "in the afternoons or the following day" and that no one supervised the crew in Howley's absence. Doc. 72-5 at 11 (37:16-38:23); *see* Doc. 72-1 at p. 4, ¶ 12. Valentin did not state whether he had a supervisor, but he noted that his crew members did not supervise his work. Doc. 72-7 at 4 (12:14-23).

Galway supplied some of the tools and equipment that Plaintiffs used while performing work for Galway. Doc. 74 at ¶ 23. Specifically, Galway provided Plaintiffs with the paint selected by its customers and allowed Plaintiffs to use the company's scaffolding, sprayers, and other tools. Doc. 72-4 at ¶ 10; Doc. 72-9 at ¶ 7; Doc. 74 at ¶ 23. Plaintiffs supplied their own brushes and a small ladder, and Valentin brought his own paint tray and rollers. Doc. 74 at ¶ 23; Doc. 72-7 at 7 (21:1-2 & 22-24, 22:1-2). Plaintiffs transported their equipment to and from job sites in their own "work trucks." Doc. 74 at ¶ 22; Doc. 72-5 at 15 (55:16-23).

Plaintiffs were paid by the hour. Doc. 72-1 at pp. 3-4, ¶¶ 9-10. Each morning, they reported to the job site at 7:00 am and worked through 5:00 pm, with a lunch break around noon. *Id*. at p. 4, ¶ 13; Doc. 72-5 at 14 (50:19-20), 18 (67:19-23); Doc. 72-7 at 7 (22:12-19), 8 (27:8-19). Plaintiffs had to receive approval to leave work before 5:00 pm or to take a day off. Doc. 72-1 at p. 4, ¶ 13. Mendiola testified that he worked from Monday through Saturday, and sometimes on Sundays when required. Doc. 72-5 at 19 (70:3-19). "[I]f there was something that [Mendiola] had to do with [his] family [on Sunday], [he] would ask [Howley]" for permission not to work that day. *Id*. at 19 (70:6-10). Mendiola further testified that he did not recruit clients, bill customers, or address their complaints, and that he did not have the authority to hire, fire, or discipline other members of his crew. *Id*. at 23 (86:6-21, 87:1-11).

The parties disagree on two matters pertaining to Plaintiffs' autonomy over their schedules. The first concerns whether they had discretion to pick and choose their job assignments. Doc. 74 at ¶ 27. Defendants assert that "Mendiola and Valentin retained control over which projects … they accepted and were free to reject projects[.]" Doc. 72-4 at ¶ 6 (Howley declaration); *see* Doc. 74 at ¶ 27. Plaintiffs assert that "when [they] finished one job they were told where to report … the next work day. There was never any discussion about

3

'taking jobs' [but rather] Howley decided what jobs to take and which workers to send to each job." Doc. 74 at ¶ 27 (citing Doc. 74-1 at ¶¶ 12-13). In Mendiola's telling, "Galway never gave [him] the option of refusing jobs." Doc. 74-1 at ¶ 9. The evidence that Plaintiffs cite to support their view at most creates a tie between the parties' positions, and that tie must be resolved in Defendants' favor on summary judgment.

Second, the parties dispute whether and, if so, to what extent Plaintiffs could accept side jobs or work for other contractors while performing jobs for Galway. Doc. 74 at ¶ 26. Defendants assert that Plaintiffs were free "to work for another contractor or on their own jobs." Doc. 72-4 at ¶ 6; *see* Doc. 74 at ¶ 26. Valentin, by contrast, testified that he was told that he was "not allowed to do any side jobs," and that he in fact did not take on side jobs while working with Galway. Doc. 72-7 at 7 (21:5-8 & 19-21). According to Mendiola, Howley did not tell him not to take on other jobs, and he completed "two or three" side jobs for friends while doing work for Galway, but he did not work for another contractor during that time. Doc. 72-5 at 15 (53:11-22), 20 (75:20-24, 76:1-3), 23 (87:16-18). Again, the dispute between the parties concerning Plaintiffs' ability to take on side jobs or work for other contractors must be resolved in Defendants' favor at this stage.

## Discussion

As noted, the complaint alleges that Defendants violated the FLSA and the IMWL by failing to pay Plaintiffs minimum and overtime wages. Doc. 1 at ¶¶ 17-50. Plaintiffs seek summary judgment as to liability on their overtime wage claim.

**I.     FLSA Claim**

The FLSA was enacted "to protect all covered workers from substandard wages and oppressive working hours." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739

4

(1981). The FLSA's overtime provision requires "employers" to pay their "employees" overtime pay for hours worked above forty per week:

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). Defendants do not dispute that Galway is a covered "enterprise" and that, if Plaintiffs were covered "employees," Howley is a covered "employer." Doc. 11 at ¶¶ 7-9; Doc. 72 at 8-15. The only disputed question—which pertains to both the overtime and minimum wage claims—is whether Plaintiffs were Galway's employees or, rather, independent contractors. Doc. 72 at 8-15.

The FLSA's text "is of little use" is assessing whether Plaintiffs were "employees" for purposes of the overtime provision. *Hollins v. Regency Corp.*, 867 F.3d 830, 834-35 (7th Cir. 2017). "Section 203(e)(1) [of the FLSA] defines 'employee' in an unhelpful and circular fashion as 'any individual employed by an employer.'" *Berger v. NCAA*, 843 F.3d 285, 290 (7th Cir. 2016) (quoting 29 U.S.C. § 203(e)(1)). "Section 203(g) broadly defines 'employ' as 'to suffer or permit to work.'" *Ibid.* (quoting 29 U.S.C. § 203(g)). Thus, "[t]o qualify as an employee for purposes of the FLSA, one must perform 'work'"—a term not defined by the statute—"for an 'employer.'" *Ibid.*

"The Supreme Court has instructed the courts to construe the term[] 'employee' … expansively under the FLSA" to accomplish its remedial purposes. *Vanskike v. Peters*, 974 F.2d 806, 807 (7th Cir. 1992) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)); *see also Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987). Consistent with that instruction, the Seventh Circuit has held that "employees [are] those 'who as a matter of

5

economic reality are dependent upon the business to which they render service.'" *Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 964 (7th Cir. 2018) (quoting *Lauritzen*, 835 F.2d at 1534). In undertaking that inquiry, courts must "utiliz[e] a broader definition of employee than the common law, and determine whether an arrangement is an employment or independent contractor relationship with a six-factor test to determine the 'economic reality' of the situation." *Est. of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 565 (7th Cir. 2009).

Determining whether an individual is dependent on a putative employer as a matter of "economic reality" involves examining and balancing the following nonexclusive factors, which have come to be called the *Lauritzen* factors:

> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> 4) whether the service rendered requires a special skill;
>
> 5) the degree of permanency and duration of the working relationship;
>
> 6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Lauritzen*, 835 F.2d at 1535. Under this standard, "no criterion is by itself, or by its absence, dispositive or controlling." *Id*. at 1534. "Instead, the inquiry is aimed at determining the economic reality of the working relationship by examining the totality of the circumstances." *Simpkins*, 893 F.3d at 965. While "the *Lauritzen* factors are not the exclusive means" for determining "employee" status under the FLSA, *id*. at 964-65, the parties agree that they supply the appropriate analytical framework here.

Before continuing, the court pauses to describe the legal and factual aspects of the *Lauritzen* analysis. The Seventh Circuit has identified "three types of findings [that are] relevant to the determination of employment status [under the FLSA]: 1) 'historical findings of fact' that underlie a finding regarding the [six *Lauritzen*] factors; 2) [factual] findings on the factors themselves, which are based on inferences drawn from the historical facts; and 3) the ultimate legal conclusion [regarding whether an individual is an "employee" or independent contractor] based on those two types of factual findings." *Id*. at 965; *see also Lauritzen*, 835 F.2d at 1535. Because "a district court makes no factual findings of its own [on summary judgment]," the court's role at this stage is limited "to determin[ing] whether … there [are] disputes of fact material to the determination of [Plaintiffs'] employment status" that preclude summary judgment against Defendants on the question whether Plaintiffs were Galway's employees. *Simpkins*, 893 F.3d at 965.

1. *The nature and degree of the alleged employer's control as to the manner in which the work is to be performed.* An employer's exercise of control over the manner in which work is performed and the details of "the operation as a whole" weighs in favor of an employer-employee relationship. *Lauritzen*, 835 F.2d at 1536. Here, the record presents several competing facts as to the degree of control exercised by Defendants over Plaintiffs' work.

On the one hand, Defendants set Plaintiffs' working hours and required them to obtain permission to leave early or take a day off. Moreover, by Mendiola's account, Howley oversaw his work in part, visiting his crew's worksites "in the afternoons or the following day." Doc. 72-5 at 11 (37:16-38:23); *see* Doc. 72-1 at p. 4, ¶ 12. Defendants also controlled most aspects of the operation as a whole: they recruited clients, directed painters to particular worksites, fielded customer complaints, and retained the authority to hire and fire crew members. *See Simpkins*,

7

893 F.3d at 966 (considering whether the defendant "required [the plaintiff] to work … set hours" when determining whether the "control" factor favored employee status under the FLSA); *Lauritzen*, 835 F.2d at 1536 (in holding that migrant pickle farmers were "employees" under the FLSA, reasoning that the "control" factor favored employee status because the defendants "occasionally visit[ed] the [farmworkers] in the fields," some workers "expressed a belief that [defendants] had the right to fire them," and the defendants exercised "pervasive control" over the "entire pickle-farming operation, not just the details of harvesting").

On the other hand, Plaintiffs received no training or instruction from Defendants and worked "basically unsupervised," and Mendiola sometimes recruited his friends to help him perform Galway jobs. *See Nassis v. LaSalle Exec. Search, Inc.*, 2018 WL 2009502, at *7 (N.D. Ill. Apr. 30, 2018) (while acknowledging that the defendants "exercised some supervision over [the] [p]laintiff's work," holding that the fact that the defendants "generally did not directly oversee the [plaintiff's] work" weighed against finding that the defendants "controlled" the plaintiff's work); *cf. Calderon v. J. Younes Constr. LLC*, 2013 WL 3199985, at *6 (N.D. Ill. June 23, 2013) (holding that the "control" factor favored employee status for construction workers because the putative employer controlled the details of their work and they "typically were not at the work site at times when [the owner of the company] was not there"); *Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 750 (N.D. Ill. 2011) (same for security guards, where the putative employer "not only … instruct[ed] [them] on exactly how they should perform their jobs, but it also closely monitored their compliance with [the company's] procedures"). Furthermore, evidence adduced by Defendants shows that Plaintiffs could accept and reject projects as they wished and were free "to work for another contractor or on their own jobs" while doing work for Galway. Doc. 72-4 at ¶ 6; *see* Doc. 74 at ¶¶ 26-27. True enough,

8

Mendiola avers that "Galway never gave [him] the option of refusing jobs," Doc. 74-1 at ¶ 9, and Valentin avers that he did not perform side jobs while working with Galway because he and his co-workers understood that they were "not allowed to do any side jobs," Doc. 72-7 at 7 (21:5-21), but Plaintiffs' version of the facts cannot carry the day on summary judgment.

Drawing all reasonable inferences from the record in Defendants' favor, the "control" factor does not favor Plaintiffs on summary judgment. *See Simpkins*, 893 F.3d at 966-67 (holding that the district court erred in holding on summary judgment that the plaintiff was not an "employee" under the FLSA, in part due to material fact disputes as to "the extent and effect of th[e] [plaintiff's] autonomy" over his schedule and work assignments); *Nassis*, 2018 WL 2009502, at *7-8 (in denying the FLSA plaintiff's summary judgment motion, noting that the record presented "conflicting evidence about the degree of control exercised by [d]efendants").

2. *The alleged employees' opportunity for profit or loss depending upon their managerial skill.* Workers are more likely to be independent contractors, not employees, if they retain the opportunity to increase their profits by exercising managerial skill and risk losing their investments with poor performance. *See Lauritzen*, 835 F.2d at 1536; *Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1077 (N.D. Ill. 2014). Plaintiffs argue that they had no meaningful opportunity to affect their "profit or loss" because they invested few of their own resources in Galway work—meaning that they had little to lose—and their profits were capped by the number of hours they worked. Doc. 60 at 7; Doc. 73 at 3. While not disputing that Plaintiffs faced little risk of *loss*, Defendants argue that Plaintiffs had the opportunity for additional *profit* by taking on side jobs and working for other contractors. Doc. 72 at 13.

This factor favors Plaintiffs. Because Plaintiffs worked a set number of hours at a fixed hourly rate—as opposed to a flat rate per job—they had no opportunity to earn additional

9

compensation by performing their work more efficiently. Nor could Plaintiffs increase their profits by exercising initiative or business judgment, for they did not solicit clients, negotiate contract prices, or share in Galway's overall profits. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947) (recognizing that an individual is more likely to be an independent contractor for FLSA purposes if his earnings depend on the exercise of "initiative, judgment[,] or foresight"); *Perez*, 55 F. Supp. 3d at 1077 (holding that maids who worked fixed hours at fixed rates were "employees," reasoning that they did not have "any autonomy to increase their earning rate through managerial discretion"); *Int'l Detective & Protective Serv.*, 819 F. Supp. 2d at 751 (holding that the "opportunity for profit or loss" factor favored employee status because the plaintiffs "were paid by the hour" and "had no opportunity, by performing their tasks efficiently and skillfully, to earn additional profit, nor did they have a share in [the defendant's] overall profits or losses"); *cf. Strom v. Strom Closures, Inc.*, 2008 WL 4852998, at *5 (N.D. Ill. Nov. 7, 2008) (holding that this factor favored independent contractor status where the plaintiff was paid a commission on each sale, thereby giving her the potential to earn more than a weekly salary).

Contrary to Defendants' submission, the fact that Plaintiffs could perform jobs for firms other than Galway has no bearing on whether they had the opportunity to increase their profits. If the opportunity to perform side jobs or work for others were relevant, "the opportunity for profit or loss" factor almost invariably would favor independent contractor status because most individuals are able to perform work for firms other than their putative employers. *See Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1441 (10th Cir. 1998) (in holding that welders paid at a fixed hourly rate did not have the opportunity to increase their profits, reasoning that their "ability to maximize their wages by 'hustling' new work is not synonymous with making a

10

profit"); *Bulaj v. Wilmette Real Estate & Mgmt. Co., LLC*, 2010 WL 4237851, at *6 (N.D. Ill. Oct. 21, 2010) (in holding that the "opportunity for profit or loss" factor favored employee status, rejecting the defendant's argument that the plaintiff janitor had the opportunity for additional profit or loss because he ran his own maintenance business while performing work for the defendant).

In short, because the amount Plaintiffs earned had no correlation to their performance, they were "far more akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investments." *Morse v. Mer Corp.*, 2010 WL 2346334, at *4 (S.D. Ind. June 4, 2010) (quoting *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 328 (5th Cir. 1993)). The "opportunity for profit or loss" factor thus favors Plaintiffs.

3. *The alleged employees' investment in equipment or materials required for their tasks, or their employment of workers.* Workers who make "large expenditures, such as risk capital, capital investments, and not negligible items or labor itself," are more likely to be considered independent contractors than employees. *Lauritzen*, 835 F.2d at 1537 (quoting *Donovan v. Gillmor*, 535 F. Supp. 154, 161 (N.D. Ohio 1982)). Plaintiffs argue that this factor favors employee status because Defendants provided them with paint and certain equipment, and "[t]here is no evidence that Plaintiffs [brought] anything else to the worksites" other than "brushes and a ladder." Doc. 60 at 8. The record is not as clear as Plaintiffs say. For one, Valentin testified that, in addition to brushes and a four-foot ladder, he supplied his own paint tray and rollers. Doc. 72-7 at 7 (21:1-2 & 22-24, 22:1-2). For another, Mendiola occasionally enlisted friends to help him perform Galway jobs, and Plaintiffs owned the trucks they used to transport their equipment to and from worksites. *Compare Derolf v. Risinger Bros. Transfer, Inc.*, 259 F. Supp. 3d 876, 882-84 (C.D. Ill. 2017) (holding that truck drivers were independent

11

contractors rather than employees in part because they leased their trucks from Defendants and were allowed to hire assistants), *with Perez*, 55 Supp. 3d at 1077 (holding that maids did not make the sorts of large personal investments typical of independent contractors, and stressing that their putative employer provided insurance, vehicles, transportation expenses, and all cleaning supplies, and prohibited them from hiring assistants).

Considering the evidence in the light most favorable to Defendants, a reasonable jury could find that Plaintiffs' and Defendants' relative investments in the equipment and materials needed to perform Plaintiffs' tasks weigh against employee status. *See Simpkins*, 893 F.3d at 966 (holding that the defendant was not entitled to summary judgment due to disputed facts concerning the parties' relative investment in the tools needed to perform the plaintiff's tasks).

4. *Whether the service rendered requires a special skill.* A specialized skillset generally favors independent contractor status. *See Lauritzen*, 835 F.2d at 1537. That said, "[s]kills are not the monopoly of independent contractors," and a worker may still qualify as an employee despite having received occupational training. *Ibid.*; *see Int'l Detective & Protective Serv.*, 819 F. Supp. 2d at 752 (holding that security guard work "did not demand a high degree of technical experience or skill" even though guards were required to receive firearms training, reasoning that most of their day-to-day work involved unspecialized tasks such as completing incident reports and walking around worksites to detect unauthorized activity); *Bulaj*, 2010 WL 4237851, at *7 (holding that a janitor did not deploy specialized skills, despite having received "training and education in certain specialized trades, including carpentry, plumbing, and electrical work," because his "day-to-day tasks principally entailed rudimentary janitorial and building maintenance").

12

The parties agree that Plaintiffs were "experienced painters" when they began performing jobs for Galway, but disagree on whether painting is a specialized skill. Doc. 74 at ¶¶ 4, 24; Doc. 60 at 8; Doc. 72 at 14; Doc. 73 at 4. As Plaintiffs see it, anyone who has ever painted a room can attest that painting is *a* skill but would not say that the task calls for a "particularly specialized" skill. Doc. 60 at 8. That argument has some intuitive appeal, but Plaintiffs neglect to account for the fact that they received training on a variety of matters—"spray techniques, manual painting, spackling and sanding[,] and in the use of scaffolding and painter stilts to reach difficult spaces," Doc. 72-4 at ¶ 8—some of which are beyond the ken of an amateur painter. Because the record does not reveal whether and, if so, to what extent Plaintiffs drew on specialized training in their day-to-day responsibilities for Galway, this factor remains subject to competing interpretations and, given the need to draw reasonable inferences in Defendants' favor, does not favor Plaintiffs on summary judgment.

5. *The degree of permanency and duration of the working relationship.* The more "permanent" and "exclusive" the working relationship, the more likely workers are to be employees. *Lauritzen*, 835 F.2d at 1537. That the duration of Plaintiffs' work for Galway occurred over an extended timeframe—at least five to six years in Mendiola's case, and about a year and a half in Valentin's—favors employee status. As noted, though, there is a material fact dispute over whether Plaintiffs were free to work for other companies while doing work for Galway, and Defendants' assertion (which, again, is taken as true at this stage) that Mendiola took a one-year break from Galway raises additional questions about the permanency of the working relationship. As with the "specialized" skill factor, the "permanency and duration" factor cannot be said to favor Plaintiffs on summary judgment. *See Nassis*, 2018 WL 2009502, at *8 (holding that this factor was "subject to competing interpretations" in light of conflicting

13

evidence on the permanence of the plaintiff's position); *Jackson v. Leader's Inst., LLC*, 2015 WL 7573228, at *7 (S.D. Ind. Nov. 24, 2015) (denying summary judgment where the record presented a "material factual dispute regarding whether the [p]laintiffs were at liberty to work for other companies").

6. *The extent to which the service rendered is an integral part of the alleged employer's business.* "Individuals are more likely to be employees if they perform the primary work of the alleged employer." *Perez*, 55 F. Supp. 3d at 1078 (internal quotation marks omitted); *see also Lauritzen*, 835 F.2d at 1537-38 (holding that pickle harvesters were an "integral part of the pickle business" because they were an essential link in the sale of pickles). There can be little doubt that Plaintiffs, who performed at worksites the painting services that Defendants offer, were an integral part of the business. Accordingly, this factor favors employee status. *See Perez*, 55 F. Supp. 3d at 1078 (holding that this factor favored employee status because "the primary business of Supermaid is providing cleaning services" and "[m]aids who work for Supermaid perform that cleaning"); *Int'l Detective & Protective Serv.*, 819 F. Supp. 2d at 753 (same, where security guards were an integral part of a security services company's business).

\* \* \*

In sum, two of the six *Lauritzen* factors—the "opportunity for profit or loss" and "integral-to-business" factors—favor Plaintiffs on summary judgment, but the remaining factors either favor Defendants or are incapable of resolution in Plaintiffs' favor at this juncture due to competing or genuinely disputed facts. Because a reasonable jury could find that Plaintiffs were independent contractors, summary judgment on their FLSA overtime pay claim is denied. *See Simpkins*, 893 F.3d at 967 (holding that the district court "erred in concluding that [the plaintiff] was not an employee under the FLSA as a matter of law" due to genuine factual disputes);

14

*Ingram v. Hagen*, 161 F. Supp. 3d 639, 644 (S.D. Ill. 2015) (denying summary judgment on a FLSA claim because several *Lauritzen* factors were inconclusive); *Nassis*, 2018 WL 2009502, at *7-8 (same).

II. **IMWL Claim**

Like the FLSA, the IMWL requires "employers" to pay their "employees" no less than one and one-half times their regular hourly wage for hours worked above forty hours in one week. 820 ILCS 105/4(a)(1); *see Haynes v. Tru-Green Corp.*, 507 N.E.2d 945, 951 (Ill. App. 1987). Because the overtime provisions of the IMWL and the FLSA are similar in scope, the same analysis governs whether a plaintiff was a defendant's employee or, rather, an independent contractor. *See Urnikis–Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 672 n. 3 (7th Cir. 2010) ("The overtime provision of the Illinois Minimum Wage Law, 820 ILCS 105/4a(1), is parallel to that of the FLSA, and Illinois courts apply the same principles[] … to the state provision."); *Condo v. Sysco Corp*, 1 F.3d 599, 601 n.3 (7th Cir. 1993) (same); *Haynes*, 507 N.E.2d at 951 (same). It follows, for the reasons given above, that Plaintiffs are not entitled to summary judgment on liability for their IMWL overtime claim. *See Ingram*, 161 F. Supp. 3d at 643-48 (denying summary judgment as to the plaintiff's status as an employee under the FLSA and the IMWL after applying the same analysis to both claims).

## Conclusion

Plaintiffs' summary judgment motion is denied. The case will proceed to trial as to liability and damages on Plaintiffs' minimum wage and overtime claims.

July 19, 2021

                                              United States District Judge